# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**STEPHEN T. OWENS**
Public Defender of Indiana

**HOPE FEY**
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN MCLEAN**
Deputy Attorney General
Indianapolis, Indiana

FILED
May 29 2013, 9:32 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

GLENN PATRICK BRADFORD,       )
                              )
    Appellant-Petitioner,    )
                              )
      vs.                  )     No. 82A01-1203-PC-129
                              )
STATE OF INDIANA,             )
                              )
    Appellee-Respondent.     )

APPEAL FROM THE VANDERBURGH CIRCUIT COURT
The Honorable Carl A. Heldt, Judge
Cause No. 82C01-9209-CF-512

**May 29, 2013**

**OPINION - FOR PUBLICATION**

**SHEPARD, Senior Judge**

Glenn Patrick Bradford was convicted of murder and arson in connection with the 1992 death of Tammy Lohr. His convictions were affirmed on appeal. Bradford now appeals the denial of his petition for post-conviction relief. We affirm.[1]

FACTS AND PROCEDURAL HISTORY

The nature of Bradford's claims makes it necessary to discuss the facts in some detail.

During the period relevant to this case, Bradford was an officer with the Evansville Police Department. He worked the night shift from 10:30 p.m. to 6:30 a.m. Trial Tr. p. 2394.[2]

Bradford had an extramarital affair with Lohr during the four years prior to her death. *Id.* at 2219. Hoping to force a split between Bradford and his wife Dawn, Lohr sent Dawn several anonymous notes in 1990 informing her of the affair. *Id.* at 2146-49. Lohr dictated the notes to male friends to disguise their origin. *Id.* at 2146. The notes caused problems in the Bradfords' marriage. Bradford promised Dawn he would end the affair, but he continued to see Lohr, regularly stopping by her house before and after his shift.

In June 1992, Dawn discovered that Bradford and Lohr's affair was ongoing. As a result, Bradford told Lohr their affair had to end and returned his copy of her house key. *Id.* at 3307. During that same month, Lohr sent Bradford seven angry e-mails about his

---

[1] We held oral argument March 26, 2013 at the Court of Appeals courtroom in Indianapolis. We thank the parties for their helpful presentations.

[2] The record for this appeal includes the original trial transcript, which we cite as "Trial Tr.," a transcript for supplemental proceedings on remand, which we cite as "Supp. Trial Tr.," and the post-conviction hearing transcript, which we cite as "PCR Tr."

attempt to end their affair. *Id.* at 2065-71. She said that if Dawn ever asked her if she and Bradford were continuing their relationship, she would "tell [Dawn] we are . . . I don't care how long we've been separated." *Id.* at 2069. Lohr reminded Bradford that the two of them had gone to a photographer to have their portrait taken, and she threatened to show the photographs to Dawn. *Id.* at 2068. Two to three weeks before Lohr's death, Bradford told his partner Officer Brian Hildenbrant that he and Lohr were having problems. *Id.* at 2220. Bradford continued to stop by Lohr's house before and after his shift on occasion.

On the evening of August 1, 1992, Lohr was at her house in Evansville. She spoke with her father on the telephone from 10:25 p.m. until shortly before 11 p.m. *Id.* at 2050. At 6:35 a.m. the next morning, Bradford reported a fire at Lohr's house. *Id.* at 833. He told the dispatcher he was at the scene and there was a fatality. *Id.* When the first responders arrived, Bradford met them and said, "Tammy's inside." *Id.* at 981. He also said, "She's dead, she's dead, she's got to be dead." *Id.* at 984. Bradford told one officer he had not been able to get inside due to fire and smoke, *id.* at 960, but he told another officer Lohr "was on the bed and the bed was on fire," *id.* at 1002. He told yet another responder, "I couldn't get her out." *Id.* at 1039. Bradford later said during questioning by detectives that he crawled into the house, saw that the fire was in the bedroom, and crawled back out. *Id.* at 2476-77.

By coincidence, one of the firefighters who went to the scene, Randy Baugh, had driven by Lohr's home at 6:30 a.m. on his way to a nearby fire station. *Id.* at 1059. He did not see any signs of fire at that time. *Id.* Bradford's report of a fire was received

3

shortly after Baugh arrived at the fire station, and he returned to Lohr's house. *Id.* at 1060. Thick black smoke was pouring out of the home's roof vents and front door. *Id.* at 1094. Baugh entered the house, found the fire in a bedroom, and extinguished it. *Id.* at 1070. He found Lohr's body on a bed in the bedroom. *Id.* at 1071. Baugh estimated that the fire could not have been burning for more than a few minutes. *Id.* at 1087. Brian Owen, another firefighter who reported to the scene, agreed with Baugh's estimate. *Id.* at 1134.

After the fire, a detective drove Bradford back to police headquarters. The detective saw Bradford sitting at a computer at around 8 a.m. *Id.* at 2389. Later, after Bradford learned that it was possible to retrieve deleted e-mails from the police department's system, Bradford admitted to a detective that he had deleted the seven angry e-mails from Lohr on the morning of the fire because "he was trying to remember her in a good light." *Id.* at 2508-09.

Evansville Police Department crime scene investigators discovered an empty gasoline can in the bedroom. *Id.* at 1301. The Evansville Fire Department's fire investigators determined that the fire was intentional; the arsonist had poured gasoline on the mattress where Lohr's body lay and on the floor leading to the bedroom door and then ignited the gasoline while standing in the doorway. *Id.* at 1985. Furthermore, fire investigators concluded that an outside observer could have seen smoke coming out of the house's attic vents within a minute of the fire igniting because the bedroom door was partially open and a "scuttle hole" to the attic was open in the hallway outside the

4

bedroom. *Id.* at 1988. Finally, an investigator concluded that the fire had not been burning for more than seven to ten minutes when Baugh extinguished it. *Id.* at 1995-96.

The medical examiner determined that Lohr had been stabbed or slashed twenty-one times on the back, right shoulder, neck, and cheek. *Id.* at 1886. One of the wounds penetrated her heart, another was in her left lung, and another penetrated her right lung. *Id.* at 1893, 1894, 1895. Lohr's carotid artery was also slashed, possibly several times. *Id.* at 1898. Her body was burned after death. *Id.* at 1903. The examiner was unable to provide a precise time of death because the fire destroyed many of the indicators that he generally considered in making that determination.

Crime scene investigators found the body of Lohr's dog, a small poodle, in the front room of the house. It had been stabbed to death. They also noted signs of an apparent break-in, including a kitchen window with the screen cut out, an open gate in Lohr's backyard, and a telephone line that had someone had manipulated. *Id.* at 964, 1321, 1326, 1559. These actions were executed in somewhat unusual ways. The screen appeared to have been cut from the inside. *Id.* at 1343. And the telephone lines had been stripped and then twisted together such that Lohr would have been unable to call out but anyone calling her number would have received a busy signal. *Id.* at 2991.

One of the investigators tried to enter the house through the kitchen window, but he could not do it by himself because he needed a ladder to reach the window, and the ladder was too unstable. *Id.* at 1395. With other investigators holding the ladder in place, he managed to climb into the kitchen, but entry was still difficult because the kitchen sink, which was full of dishes, was right under the window. *Id.* at 1396-97. The

5

investigators also noted that there were no indentations in the ground below the kitchen window when they first examined it, but the ladder they used left indentations. *Id.* at 1398. In addition, the back door to the house was locked from the inside when the first responders arrived. *Id.* at 1577. Finally, nothing had been stolen. *Id.* at 1560. The investigators concluded that someone had staged a burglary. *Id.* at 1557.

Next, the evidence revealed a gap in Bradford's whereabouts on the night of August 1 between 10:57 p.m. (when Bradford purchased gas for his patrol car) and 11:49 p.m. (when he was seen driving by a restaurant in central Evansville). *Id.* at 55, 2290, 2668, 2845. A witness saw a marked patrol car at Lohr's house that night at around 11 p.m. *Id.* at 1814. A log kept by Bradford shows that during that period he reported to a hit and run at Main and Michigan, but the officer working the accident, Eric Middendorf, testified he did not see Bradford at the scene. *Id.* at 55, 2813. At 11:26 that evening, Bradford contacted dispatch to request information about George Russell, whom he claimed to have seen. *Id.* at 55, 2779, 3367. However, Russell testified he was at his brother's house at that time. *Id.* at 1804. As for the next morning, a bank located near Lohr's home had an ATM camera directed toward the street, and it captured an image of Bradford's car traveling toward Lohr's home at around 6:30 a.m.

The State charged Bradford with murder and arson. Bradford filed a Notice of Alibi, alleging that he was working when the crimes occurred. During trial, the court allowed the jury to view the crime scene, and jurors visited Lohr's house. Bradford presented evidence in support of his alibi. He also presented expert testimony from Barker Davie, a forensic chemist and fire investigator, to the effect that that the fire had

6

been started before Bradford arrived that morning. *Id.* at 3041. On June 18, 1993, the jury found Bradford guilty as charged. The court sentenced him to eighty years, the maximum possible sentence.

Bradford appealed, and his case went directly to the Indiana Supreme Court. Bradford asked to suspend the appeal and remand to the trial court to clarify the record and hold hearings on newly-discovered evidence. The Court granted Bradford's request. The trial court held a supplementary evidentiary hearing and determined that Bradford was not entitled to a new trial. In due course, the Supreme Court affirmed. *Bradford v. State*, 675 N.E.2d 296 (Ind. 1996).

Bradford filed a petition for post-conviction relief. Thereafter, the State Public Defender's Office conducted an extended investigation. During a two-day hearing, Bradford presented testimony from Douglas Carpenter, a fire protection engineer. Carpenter had reviewed the record and performed his own test on a door from Lohr's house. He concluded that the fire began between 4:30 and 6 a.m. PCR Tr. p. 271. On March 2, 2012, the court issued Findings of Fact, Conclusions of Law, and Judgment denying Bradford's petition.

## ISSUES

Bradford raises these four issues on appeal:

I.   Whether the post-conviction court erred by determining that Bradford's new evidence did not require a new trial.

II.  Whether the prosecutors engaged in misconduct at trial.

III. Whether Bradford received ineffective assistance of trial counsel.

7

IV.     Whether Bradford received ineffective assistance of appellate counsel.

DISCUSSION AND DECISION

A post-conviction petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. *Ritchie v. State*, 875 N.E.2d 706, 713 (Ind. 2007). When appealing from a denial, that petitioner stands in the position of one appealing from a negative judgment. *Id.* at 714. Where, as here, the post-conviction court enters findings and conclusions in accordance with Indiana Post-Conviction Rule (1)(6), we will reverse its findings or conclusions as being contrary to law where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion. *Hall v. State*, 849 N.E.2d 466, 469 (Ind. 2006).

I. Newly-Discovered Evidence

Bradford contends that Carpenter's testimony, which he believes establishes that the fire started well before he arrived at Lohr's house, is newly-discovered evidence that entitles him to a new trial.

When reviewing a post-conviction court's decision as to whether new evidence mandates a new trial, we consider whether: (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial. *Carter v. State*, 738 N.E.2d 665, 671 (Ind. 2000). We carefully analyze these nine factors

8

because "the basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized." *Id.*

The defense expert at trial, Davie, testified he had visited Lohr's house and reviewed reports, witness statements, depositions, and a videotape to learn about the case. He said that thick black smoke would not be seen coming from the house's roof vents in the early stages of the fire because the mostly closed bedroom door would have prevented the smoke from escaping with sufficient intensity. Trial Tr. p. 3075. The fire would not begin to increase in intensity, Davie said, until the bedroom door burned through. *Id.* at 3081. Davie told the jury that the fire burned a hole through Lohr's bedroom door in seven to ten minutes. *Id.* at 3086. He concluded that based on witness testimony and his understanding of the manner in which the fire developed, it was "highly improbable" Bradford would have had sufficient time to start the fire. *Id.* at 3124. He determined the fire burned for a total duration of at least fifteen minutes. *Id.* at 3255.

At the post-conviction hearing, the new witness Carpenter testified he reviewed a video of the crime scene, reports from fire investigators, a diagram of the house, depositions, portions of the trial testimony, and a necropsy report issued by a veterinarian who had examined the remains of Lohr's dog. In addition, he visited Lohr's house. Carpenter obtained a closet door from Lohr's house that was of the same vintage of the burned bedroom door and performed his own tests on it. PCR Tr. p. 170. Like Davie, Carpenter calculated a burn-through rate for the bedroom door, and he concluded the State overestimated the rate at which a hole burned through the door. *Id.* at 166. Carpenter rejected Davie's method of calculating the burn-through rate, asserting Davie's

9

method had been rejected by fire science experts even before Bradford's original trial. *Id.* at 197. He also disagreed with several other aspects of Davie's fire analysis as well as the analyses of the State's witnesses. Carpenter prepared a computer model of the fire using eyewitness testimony, his own test results on the closet door, the condition of the other contents of the room, and the amount of carboxyhemoglobin found in the corpse of Lohr's dog. Based upon his review of the evidence, Carpenter concluded the fire started sometime between 4:30 and 6 a.m. *Id.* at 271.

We think the post-conviction court correctly determined that Carpenter's testimony did not require a new trial. Carpenter's testimony was largely cumulative of Davie's because he used much of the same evidence to arrive at the same essential position as Davie: the fire must have started well before the State said it did, and therefore Bradford could not have set it. Thus, rather than obliterate previous unfavorable evidence, Carpenter's testimony at most merely impeached testimony by Davie and the State's witnesses that was unfavorable to Bradford. *See Baird v. State*, 688 N.E.2d 911, 915 (Ind. 1997) (trial court properly rejected newly-discovered medical expert testimony because the expert offered "another, perhaps more medically advanced opinion, but an opinion that significantly overlaps with those already proffered" and the opinion was "cumulative not pathbreaking").

Moreover, Carpenter conceded an engineer could have performed his door burn-through test at the time of Bradford's original trial, and the computer modeling he used was also available then. Bradford asserts Carpenter's testimony is nonetheless newly-discovered because Carpenter relied on glass breakage data that was not published until

10

1997 and polyurethane mattress burn-rate data not published until 2003. However, Carpenter acknowledged that someone could have determined the mass loss rate for the mattress and the glass breakage data at the time of trial. PCR Tr. p. 258. He also agreed that if he had been able to generate that information himself, his opinion as to the duration of the fire would have been the same in 1992 as it was at the time of the post-conviction hearing. *Id.* Thus, the evidence cited by Bradford could have been discovered at the time of trial.

Bradford cites *Bunch v. State*, 964 N.E.2d 274 (Ind. Ct. App. 2012), *trans. denied*. Bunch was accused of setting a fire that killed her three-year-old child. She was convicted of felony murder "largely on expert testimony describing [the] points of origin for the fire." *Id.* at 280. In her defense, Bunch had presented evidence that her home had electrical problems and called an arson investigator who testified the fire was most likely accidental. The Supreme Court affirmed the felony murder conviction, noting that accelerant appeared to have been used to start and strengthen the fire.

Bunch's post-conviction petition claimed newly-discovered evidence in fire victim toxicology and fire investigation entitled her to a new trial. On appeal from a denial of relief, a panel of this Court determined that Bunch's expert toxicology evidence met the requirements for newly-discovered evidence. The Court noted that the new expert reviewed the victim's autopsy and toxicology reports and indicated the results were consistent with an accidental fire rather than an intentionally-set fire aided with an accelerant. The expert also stated that Bunch's toxicology results were consistent with her version of events and she did not intentionally set the fire with liquid accelerant.

11

This Court determined that the new expert's testimony was based on "transformative advancements" in fire victim toxicology science. *Id.* at 288. Furthermore, the new testimony was not cumulative of evidence Bunch presented at trial because her methods were "considerably different" from those of her trial expert. *Id.* at 291. Specifically, the trial expert had not testified as to the relationship between the victim's physical condition and the origin determination. Next, the Court determined the evidence was not merely impeaching because it offered "a new, exculpatory explanation for [the victim's] death." *Id.* Finally, the panel concluded the new testimony would probably produce a different result at retrial because it was "if not entirely consistent with the eyewitness testimony, at least not inconsistent with it." *Id.* at 296.

The present case differs from *Bunch* in several substantial respects. For one thing, Carpenter's testimony was not based on major advancements in fire investigation science. He conceded that although new standards for polyurethane mattress burn rates and glass breakage rates had been issued since Bradford's trial, the relevant data could have been discovered through testing techniques that were available at the time of trial. Furthermore, Carpenter agreed an engineer could have performed his door burn-through rate test and his computer modeling at the time of trial. Thus, his methods were not considerably different from those that could have been used at Bradford's trial.

Perhaps a more telling difference is that Carpenter's testimony did not offer a new, different explanation for the fire but rather attempted to prove the same claim that Bradford originally presented at trial—that the State's estimates of when the fire began were incorrect.

12

Finally, *Bunch* repeatedly noted that the State had failed to prove motive or other evidence that would show that Bunch intentionally set the fire. Here, the State provided evidence that Bradford had tried and failed to end his affair with Lohr and that the affair was causing problems in his marriage. *Bunch* does not compel reversal of the post-conviction court, and we find no clear error on this issue.

## II. Prosecutorial Misconduct

Bradford contends prosecutors engaged in misconduct in the course of questioning witnesses, warranting a new trial.

In reviewing such a claim, a court first determines whether the prosecutor engaged in misconduct and then determines whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which the defendant should not have been subjected. *Stephenson v. State*, 742 N.E.2d 463, 482 (Ind. 2001). The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's verdict, not the degree of the impropriety of the conduct. *Id.*

Bradford claims the prosecutors committed two wrongs at trial: (1) they used Barker Davie's deposition to impeach him in an improper, misleading manner as to the duration of the fire; and (2) they allowed Donald Johnson, an agent with the Bureau of Alcohol, Tobacco, and Firearms, to testify that he was not collecting any fees or "private expenses" for testifying, when in fact the State paid $727.46 for Johnson's travel and

meals. Trial Tr. p. 3836.[3] Both of these claims were available on direct appeal because they could have been raised during the supplemental proceedings that the Supreme Court permitted Bradford to pursue before deciding the merits of that appeal. As the Supreme Court did in *Ward v. State*, 969 N.E.2d 46, 85 (Ind. 2012), we conclude these claims are unavailable because they could have been raised on direct appeal.

## III. Assistance of Trial Counsel

Bradford asserts that his trial attorneys committed multiple mistakes that rendered his trial unfair. To establish a claim of ineffective assistance of trial counsel, a defendant must demonstrate that counsel performed deficiently, and the deficiency resulted in prejudice. *Lee v. State*, 892 N.E.2d 1231, 1233 (Ind. 2008). To establish prejudice, a defendant must show a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different. *Henley v. State*, 881 N.E.2d 639, 644 (Ind. 2008).

Counsel's performance is presumed effective, and a claimant must offer strong and convincing evidence to overcome this presumption. *Ritchie*, 875 N.E.2d at 714. If we can resolve an ineffective assistance claim on the question of prejudice, we need not address whether counsel's performance was deficient. *Helton v. State*, 907 N.E.2d 1020, 1023 (Ind. 2009).

---

[3] Bradford's trial counsel rehabilitated Davie on redirect by allowing him to reiterate his opinion that the fire's duration was at least fifteen minutes, so the prosecution's use of Davie's deposition to allegedly mislead him on cross-examination into apparently agreeing that the fire was of much shorter duration did not place Bradford in grave peril. Furthermore, in light of all of the evidence presented at trial, we cannot say that the jury's verdict was affected by the State's failure to tell the jury that it paid or intended to pay Johnson's travel and meal expenses.

A. Impeachment of George Russell

At trial, the State presented testimony from George Russell that he was at his brother's house on the night of Lohr's murder. This testimony contradicted Bradford's activity log, which showed that Bradford asked dispatch for information on Russell at 11:26 p.m., indicating he had seen Russell out and about at that time.

Bradford first argues that his counsel should have impeached Russell with a 1986 robbery conviction. To be sure, at the time of Bradford's trial a conviction of robbery was admissible to attack the credibility of an adult witness. *See Storey v. State*, 552 N.E.2d 477, 481 (Ind. 1990) (infamous crimes, including robbery, may be used for impeachment).

We cannot say that Bradford was prejudiced by his attorneys' failure to inform the jury of Russell's robbery conviction. The conviction was over six years old at the time of trial and was committed when Russell was sixteen, and jurors may have concluded that it was too remote in time to provide insight into his character. Furthermore, Russell admitted under cross-examination that Bradford had arrested him in the past, and such an admission seems more damaging to Russell's credibility than an old conviction because the arrest provided a more personal motive for Russell to lie to harm Bradford. Moreover, Bradford's alleged sighting of Russell was only one of the gaps in Bradford's activity log, and the jury could have concluded that even if Russell was not credible due to a past conviction, there was still ample time for Bradford to have murdered Lohr over the course of the evening.

15

Next, Bradford argues that his attorneys failed to adequately impeach Russell with a prior inconsistent statement. During a pretrial deposition, an officer who had interviewed Russell said that Russell told him he had been "cruising around" that evening. PCR Tr. Vol. III, Petitioner's Ex. 20, p. 7. Bradford acknowledges that his counsel attempted to generally impeach Russell as to his whereabouts that night, but he says his counsel should have impeached him with the officer's deposition testimony.

At trial, Bradford's counsel impeached Russell as follows:

Q:     On the evening of August 1st, were you out driving?

A:     No.

Q:     You were nowhere out at all on August 1st?

A:     No.

. . . .

Q:     Do you remember talking to an investigator in this case earlier?

A:     Hm-hm.

Q:     Is he here in the courtroom today? See the man back there in the gray hair?

A:     Yeah.

Q:     Do you remember talking to him before?

A:     Yeah.

Q:     Did you ever tell him that that night you were close to downtown driving?

A:     Excu [sic] . . . I didn't understand you.

Q: Did you ever tell him that you were close to downtown driving that night?

A: No.

Q: You never told him that?

A: No.

Trial Tr. pp. 1801-03. Thus, Bradford's counsel indicated to the jury that Russell was contradicting his past statement to the police, a direct challenge to Russell's credibility on this point. His counsel could have reasonably decided that using the officer's deposition testimony to further impeach Russell would belabor the point and distract the jury during a protracted trial. Furthermore, Russell's trial testimony and the officer's deposition testimony are not necessarily contradictory, because Russell testified at trial that he had driven to his brother's house earlier in the night.

Bradford cites *Ellyson v. State*, 603 N.E.2d 1369 (Ind. Ct. App. 1992), in which a panel of this Court concluded that trial counsel was ineffective for failure to lay the groundwork to impeach a witness with prior inconsistent statements. By contrast, Bradford's counsel <u>did</u> follow the procedures for impeachment and provided a basis for the jury to infer that Russell was contradicting a past statement to law enforcement. The post-conviction court did not err on this issue.

B. Rehabilitation of Expert Witness Davie

Bradford argues that the State used Davie's deposition testimony at trial to mislead Davie into agreeing with its theory that the fire was of short duration, and his counsel should have done a better job of rehabilitating Davie on redirect examination.

At trial, Davie testified on direct examination that the fire had to have been ignited before Bradford arrived. On cross, the following exchange occurred:

Q:     You told me in a deposition that you thought this could be a seven minute fire, right?

A:     I don't believe I said that at all. Can you quote me the line and page?

Q:     About page 48, line 14, well a couple of lines up there. "Answer: Seven minute fire with that much heat that would still be pushing it. Question: But I'm looking for the absolute outside. Are you saying that's possible? Answer: Not probable but possible. Only very, very, very remotely possible."

A:     That's correct, the least degree of possibility that I can think about.

Trial Tr. p. 3230. Reading the deposition quote in context establishes that the State had asked Davie if the fire burned for seven minutes before Bradford reported it, not the total duration of the fire from ignition to extinguishment. *Id.*

On redirect examination, the following discussion occurred:

Q:     Mr. Davie, do you know of anything after your cross-examination and this testimony that changes your opinion about the length of time that the fire could have burned?

A:     No.

Q:     Mr. Levco asked you about the very, very possibly seven minutes, correct?

A:     [no answer in transcript]

Q:     But is it a fair statement to say that consistent with the evidence in front of you and not leading into speculation so much the fire would likely burn longer than seven minutes?

A:     Yes, it would.

18

Q:     Your opinion is fifteen minutes or longer?

A:     That's correct.

*Id.* at 3254-55. Thus, Bradford's attorneys specifically addressed the issue on redirect examination and allowed Davie to re-state his opinion about the total length of the fire. We cannot conclude that the attorneys performed deficiently by failing to also show the jury that the State had selectively quoted from Davie's deposition. The post-conviction court did not clearly err by rejecting this claim.

### C. Failure to Hire a Different Expert Witness

Bradford says that Davie was such an inadequate expert witness that hiring him instead of someone else was ineffective assistance. Selection and presentation of expert witness evidence are strategic choices, and we give deference to counsel's choice of strategy and tactics. *Ward*, 969 N.E.2d at 64.

Bradford's attorneys hired Davie well in advance of trial. Davie had a degree in chemistry and had attended numerous specialized seminars in fire investigation. He co-owned a fire investigation business and had analyzed "approximately 1700 fire/explosion scenes to determine the causes and origin of fire." Trial Tr. p. 3043. Davie was a member and former officer of numerous national and state fire investigation associations. He had published seven articles, lectured frequently at law enforcement and other fire investigation organizations, and testified in trials. Bradford's attorneys thought Davie's testimony would have a strong impact upon the jury because he had testified for the State "over twenty times" and had always helped to obtain convictions. PCR Tr. p. 33. Until Bradford's case, Davie had never testified for the defense in a criminal matter. Trial Tr.

19

p. 3260. Indeed, one of the State's experts testified at trial that Davie had a good reputation in the fire investigation community. *Id.* at 3835. These factors demonstrate the attorneys' selection of Davie was not deficient performance.

Bradford says Davie made use of an obsolete standard in determining how long it took for the fire to burn through Lohr's bedroom door, and trial counsel should have hired a different expert who would not have used that standard. However, the National Fire Protection Agency did not discard the burn-through standard used by Davie until early 1992, only a few months before trial. PCR Tr. p. 197. We cannot say that Bradford's attorneys were required to be as well informed in fire investigation science as the experts and as such rendered deficient performance by being unaware of this change and by continuing to use Davie's services.

Next, Bradford notes that Davie, unlike Carpenter, was not an engineer by training and therefore was unqualified to perform the work that Carpenter did. However, Davie was clearly qualified to discuss fire investigation procedures and the potential causes and characteristics of fire. Bradford's counsel did not perform deficiently merely because another expert may have provided a different perspective based on different training. *See Ward*, 969 N.E.2d at 65.

Finally, Bradford contends that someone had once challenged Davie's methods in a written response to one of Davie's published articles. We cannot say that Bradford's attorneys acted unreasonably in hiring Davie merely because his methods were questioned in writing once over the course of his lengthy career.

20

For these reasons, the post-conviction court did not commit clear error by rejecting Bradford's claim that his attorneys should have hired a different expert.

### D. Failure to Challenge a Jury Instruction

Bradford argues that his attorneys failed to object to a defective jury instruction, which he says caused the jury to consider improper evidence and resulted in an unjust verdict. To establish ineffective assistance of counsel due to failure to object, a defendant must prove that an objection would have been sustained if made and that he was prejudiced by the failure. *Kubsch v. State*, 934 N.E.2d 1138, 1150 (Ind. 2010).

In Bradford's trial, Final Instruction Fourteen provided:

> The credibility of a witness may be attacked by introducing evidence that on some former occasion the witness made a statement, or made a written statement in former testimony, testified or acted in a manner inconsistent with his or her testimony in this case. It is inconsistent if the witness denied making the prior statement or if the witness could not remember making the prior statement. Evidence of this kind may be considered by you in deciding the weight to be given to the testimony of that witness as well as substantive evidence of the guilt of the defendant.

Trial Tr. p. 213. The parties agree that this instruction was taken from pattern jury instructions regularly employed at the time of trial. Bradford notes that in *Modesitt v. State*, 578 N.E.2d 649, 653-54 (Ind. 1991), the Indiana Supreme Court held prior statements could no longer be considered as substantive evidence of guilt unless: (1) the prior inconsistent statement was given under oath; (2) the prior statement was consistent with the declarant's testimony and is offered to rebut an express or implied charge against

21

the declarant of recent fabrication or improper influence or motive; or (3) the statement is one of identification of a person made after perceiving the person.[4]

It appears that Final Instruction Fourteen did not conform to the holding in *Modesitt*. Consequently, had Bradford's counsel objected to the instruction on that basis, it would have been sustained.

As for possible prejudice, Bradford makes two points. First, he claims the State improperly impeached Davie with his deposition (asking more or less, "you told me in your deposition it could have been a seven-minute fire, didn't you?"), and the jury therefore could have improperly considered the "inconsistent" deposition as substantive evidence. Of course, in *Modesitt* the Court held that prior statements under oath, such as a deposition, are admissible as substantive evidence. Thus, the jury could have properly considered inconsistent statements in Davie's deposition as substantive evidence, and Bradford suffered no prejudice from the instruction in this regard.

Second, Bradford notes that during trial his wife Dawn denied that Bradford's partner Hildenbrant asked her whether she thought Bradford committed the crimes. She further denied that she answered Hildenbrant's question by saying: "I don't know, he's been acting strange lately, he's crazy." Trial Tr. pp. 2781-82. Subsequently, the State put Hildenbrant on the stand. He testified that he had asked her whether she thought Bradford was guilty and that she responded, "I don't know, he's been acting strange

---

[4] This holding was later incorporated into Indiana Evidence Rule 801(d), which took effect on January 1, 1994.

22

lately, he's crazy." *Id.* at 3735. Bradford argues that the jury improperly considered this prior inconsistent statement as substantive evidence and it was highly prejudicial.

We disagree as to the question of prejudice. Bradford conceded at trial that his behavior in the days following Lohr's murder could be described as "crazy" because he worried about the possibility of intruders coming into his house or a fire breaking out. *Id.* at 3452-53. Thus, Dawn's characterization of his conduct was supported by other evidence. Under the circumstances of all of the evidence presented in the case, we cannot conclude that Dawn's prior inconsistent statement prejudiced Bradford to the extent that the outcome would have been different if Bradford's counsel had objected to Final Instruction Fourteen and the jury had not been told it could consider prior inconsistent statements as substantive evidence.

### E. Cumulative Effect of Mistakes

Bradford contends that his counsel's mistakes, when considered together, establish that he received ineffective assistance.

There are two points on which Bradford's trial counsel rendered deficient performance, as described above. Nevertheless, considering the entirety of this case, in which the trial lasted several days and involved dozens of witnesses, and his counsel's vigorous pursuit of an alibi defense and attempts to disprove or undermine the State's expert fire investigation evidence, we cannot say that the cumulative impact of the mistakes fell below an objective standard of reasonableness or altered the outcome of the trial. *See Potter v. State*, 684 N.E.2d 1127, 1135 (Ind. 1997) (counsel's overall strategy was reasonable and any mistakes did not affect the outcome, so the cumulative effect did

not amount to ineffective assistance). Consequently, the post-conviction court did not clearly err in denying Bradford's claims of ineffective assistance of trial counsel.


IV. Assistance of Appellate Counsel

Bradford says his appellate lawyers should have argued that the trial court erred by allowing firefighters Randy Baugh and Brian Owen to state their opinions as to how long the fire had been burning before they arrived at Lohr's house. He contends that Baugh and Owen were not qualified to offer expert opinions.

At the time of Bradford's trial, the Indiana Rules of Evidence had not yet been adopted. Still, it was well established that for a witness to qualify as an expert in a specific field, the subject matter must be related to some scientific field beyond the knowledge of the average lay person, and the witness must have sufficient skill, knowledge, or experience in the field to make it appear that the witness's opinion will aid the trier of fact. *Wissman v. State*, 540 N.E.2d 1209, 1212 (Ind. 1989). Even if evidence is not beyond the knowledge and experience of the average juror, the expert may nevertheless testify concerning special knowledge of the subject. *Id.* at 1213.

Baugh was a captain with the Evansville Fire Department. He had been with the department for ten years and had fought at least fifty fires. Trial Tr. pp. 1054-55. He attended seminars in firefighting and had been certified as a Master Firefighter in tactics. *Id.* at 1054. Baugh's training also included studying the manner in which fires burn under different conditions and the effects of ventilation on fires. *Id.* at 1082. Owen had been with the Evansville Fire Department for twenty-one years and worked on hundreds

of fires. *Id.* at 1122. They both testified that based on the amount of smoke coming from Lohr's house, it had only been burning a short time. *Id.* at 1087, 1133-34. Bradford objected to Baugh and Owen testifying as experts. At one point, Bradford said Baugh was not specifically qualified to testify as an expert on "fire behavior," and the trial court determined that the objection went "to weight not admissibility." *Id.* at 1073.

Bradford's appellate counsel could have reasonably concluded that the Supreme Court would affirm the trial court's decision to allow Baugh and Owen to testify as witnesses with specialized knowledge. *See Wissman*, 540 N.E.2d at 1213 (no error in allowing pathologist to testify to the angle of the gunshot wound, although the pathologist lacked specialized training in ballistics, because the lack of that specialized training went to the weight of the testimony, not admissibility, in light of his other qualifications). Consequently, it would have been a reasonable choice for counsel to present other, stronger issues instead. None of the claims counsel presented on appeal prevailed, but we cannot say that the claim Bradford presents here was stronger than each of the claims that counsel chose to raise. We find no clear error in the post-conviction court's ruling.

CONCLUSION

For the reasons stated above, we affirm the judgment of the post-conviction court.

Affirmed.

RILEY, J., and VAIDIK, J., concur.

25