In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-3271

RONALD D. WILLIAMS,

*Petitioner-Appellant*,

*v.*

BRUCE LEMMON, Superintendent of the Wabash Valley
Correctional Facility,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:05-CV-624-LJM-WTL—**Larry J. McKinney**, *Judge*.

ARGUED OCTOBER 2, 2007—DECIDED MARCH 4, 2009

Before EASTERBROOK, *Chief Judge*, and MANION and
WILLIAMS, *Circuit Judges*.

PER CURIAM. An Indiana jury found Ronald Williams
guilty of murder, and the state trial court sentenced him to
75 years' imprisonment. Williams's conviction and sen-
tence were upheld on direct appeal and on collateral
review in the Indiana courts. Williams then petitioned for
a writ of habeas corpus. The district court denied that

petition. We issued a certificate of appealability on the question whether his trial counsel rendered constitutionally deficient assistance. On appeal Williams faults trial counsel for failing to interview one of two other people who arrived at the scene where the murder was committed.

## I.

In May 1998 Matthew McGarvey traveled by car with friends to a neighborhood in Indianapolis, Indiana, to buy crack cocaine. When they arrived at approximately 11:00 PM, McGarvey left the car and went alone to make his purchase. Within minutes he suffered a head injury that caused his death. McGarvey's friends were parked roughly 200 feet from where he was beaten and did not see or hear what happened. But Adair Smith and Howard Deford, also looking to buy drugs that night, had a better view.

Deford and Smith drove away after seeing McGarvey on the ground; they did not call the police. Authorities first learned about them several weeks later when a detective went to Smith's residence to question her live-in boyfriend about an unrelated homicide. Smith wanted to cooperate, hoping that it would help her boyfriend. Knowing that the officer would be interested in information about the McGarvey murder, she volunteered that she and Deford had happened upon the scene and witnessed McGarvey on the pavement surrounded by attackers. Williams, she said, struck McGarvey on the head with a black metal pole while others punched and kicked him.

Police promptly asked Deford for his version of the incident. Deford, who had been driving, said that the attack had ended before he saw anything. All that he could say of his own knowledge was that McGarvey was prone on the street, while other men (the same people who Smith had named) were laughing as they left. Despite this denial of personal knowledge, he also narrated details of the attack; according to Deford, Smith had told him these details. Some of the details that Deford furnished did not match those in Smith's statement, but Deford said that Smith had told him that "she'd seen a bunch of guys kicking this guy on the street . . . [and] a guy named Blackie [Williams] hit him with a pipe."

Williams and five codefendants were charged with murder. Smith was deposed about three weeks before trial. Contradicting what she had told the detective, Smith testified that McGarvey was still standing when she and Deford turned a corner and saw him for the first time. All of the defendants, she said, were kicking and punching him, and he fell to the ground after Williams hit him on the head with a black pole. Smith repeated several times during her deposition that Deford had "seen it all," but she also maintained that "by law, he's blind." Although Williams's appointed counsel, Mark Inman, participated in Smith's deposition and had read Deford's statement, he did not interview or subpoena Deford.

The defendants were tried jointly, with Smith as the state's primary witness. At the February 1999 trial, Smith repeated her assertions that she saw McGarvey "getting beat up" by the defendants. Smith insisted that while

seated in Deford's car she saw Williams hit McGarvey on the head with a black pole. She also identified several other attackers and specifically described how each punched, kicked, or otherwise assaulted him. Smith conceded, though, that she had been smoking crack and marijuana on the night of the incident, and that she told the detective initially that she saw seven men beating McGarvey, not six as she said at trial. She conceded that when first interviewed she told the detective that McGarvey was on the ground, not standing, when she and Deford arrived. Smith also admitted that she agreed to speak with the detective in an effort to get her boyfriend "out of trouble." Deford was not called by any party. The jury found Williams guilty of murder. Four of Williams's codefendants were convicted of involuntary manslaughter, and the other was acquitted.

Williams appealed, arguing that (1) the state's evidence was insufficient to support his conviction, (2) the trial court abused its discretion in excluding evidence that Smith had "previously worked for the State as a confidential informant while using drugs"; and (3) the trial court should have dismissed the indictment because the prosecutor waited until trial to disclose the notes of police witnesses. The Court of Appeals of Indiana upheld Williams's conviction, as did the state supreme court. See *Williams v. State*, 749 N.E.2d 1139 (Ind. 2001). The state appellate court also upheld the convictions of his codefendants. See *Gardner v. State*, 724 N.E.2d 624 (Ind. App. 2000).

Williams petitioned the state judiciary for post-conviction relief, arguing that his trial counsel had furnished

ineffective assistance. Williams submitted an affidavit from Deford averring that he would have testified favorably to Williams if he had been called at trial. The trial court conducted a two-part evidentiary hearing on Williams's petition. At the first part in March 2004, Inman testified that he had not interviewed Deford because Smith had said that Deford is legally blind. Nothing in the record suggests that Inman independently verified this allegation. At the hearing Inman stated that he typically would not interview a potential witness whose testimony would be "inculpatory or . . . neutral." But Inman admitted that Deford's statement to the police that his knowledge of the murder was limited to what Smith had told him contradicted her testimony that Deford had witnessed the entire incident. Inman also conceded that it would have made sense to interview Deford. When asked whether he had any explanation for not contacting Deford, Inman replied that he did not.

Deford was subpoenaed but became ill, so at the second part of the hearing in June 2004 Williams entered into evidence the discovery deposition given by Deford on April 20, 2004, during the post-conviction proceedings. Deford had said in 1999 that he was working as a tow-truck driver. Had he been called at Williams's trial, he said, he would have testified that neither he nor Smith saw McGarvey being attacked. According to Deford, Smith could not have seen the assault because McGarvey was lying on the ground by himself when he and Smith arrived at the scene; Deford said that he had assumed that McGarvey was intoxicated. Deford acknowledged that he saw a group of men, including one of Williams's

codefendants, standing in the street that night, but he said that the closest man "was about 10, 15 feet away" from McGarvey. Deford wore thick eyeglasses during the videotaped deposition, but he was not asked whether his vision impaired his perception of the crime scene.

The trial court denied Williams's petition for post-conviction relief. The court reasoned that Deford's testimony would not have changed the trial's outcome because his statement to the police in July 1998 that he "did not actually see anything" conflicted with his deposition testimony that Smith could not have seen the defendants attack McGarvey. See *Williams v. State*, No. 49G03-9807-PC-123641 (Marion Superior Ct. Aug. 9, 2004) (unpublished decision). The court also declared that Deford's deposition testimony was "not credible, especially considering the visual impairment he faces." And, the court continued, Deford's absence had not prejudiced Williams because at trial Smith was "impeached with her prior inconsistent statements." The Court of Appeals of Indiana agreed with these conclusions. That court asserted that Inman "chose not to investigate Deford because his testimony would have been incriminating or neutral," and concluded that Inman's decision was "a matter of trial strategy" it would not second-guess. See *Williams v. State*, No. 49A04-0409-PC-482 (Ind. App. Feb. 3, 2005) (unpublished decision). It follows, the court said, that Williams "failed to establish prejudice because he did not demonstrate that, but for counsel's error, the result of the proceeding would have been different."

Williams then sought collateral review in federal court. The district court observed that "Smith's trial testimony

of Williams' attack on McGarvey was devastating to Williams. Any information casting doubt on Smith's account could have been useful to Williams's defense." But the district court concluded that the Indiana court had correctly applied *Strickland v. Washington*, 466 U.S. 688 (1984), and that it was not unreasonable for that court to find that Inman's decision not to call Deford did not constitute deficient performance because his testimony "would have been incriminating or neutral." Quoting the court of appeals's conclusion, the district court determined that Williams failed to establish prejudice "because he did not demonstrate that there was a reasonable probability that, but for trial counsel's error, the result of the proceeding would have been different." The district court therefore denied Williams's petition.

## II.

Williams maintains that he received ineffective assistance because his lawyer did not interview Deford, who, five years after the trial, said that he had not seen Williams beat the victim and that Smith, the passenger in his car who had identified Williams as an assailant, could not have seen Williams do it. Although Williams chastises his lawyer for this omission, he does not tell us what his lawyer did do in his defense, and this is a big omission.

When a prisoner seeks a writ of habeas corpus from a federal court, the question is whether the state court applied the Supreme Court's precedents reasonably, not whether it did so correctly. 28 U.S.C. §2254(d); *Holland v.*

*Jackson*, 542 U.S. 649 (2004) (discussing the statute and the Court's earlier decisions on the scope of review). Our first question is whether single oversights by counsel violate the sixth amendment. The answer is no. The Supreme Court insists that judges must not examine a lawyer's error (of omission or commission) in isolation. See, e.g., *Strickland*, 466 U.S. at 690–96. It is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the "counsel" of which the sixth amendment speaks. The Court has allowed for the possibility that a single error may suffice "if that error is sufficiently egregious and prejudicial*." Murray v. Carrier*, 477 U.S. 478, 496 (1986). Lest this exception swallow the rule, however, we must take the Justices at their word and search for an "egregious" error—an omission of something obviously better (in light of what was known at the time) than the line of defense that counsel pursued. But Williams does not contend that the state court acted unreasonably in evaluating whether the error was "egregious" when compared with what Inman did for his client.

The state's appellate court analyzed counsel's entire performance and observed that it included "consulting with [Williams], formulating a theory of defense, conducting an investigation to support that theory, deposing witnesses, objecting to jury instructions, cross-examining the [State's] witnesses, objecting to the admission of the State's evidence, moving for dismissal of the charge, moving for a judgment on the evidence, and arguing his theory of defense to the jury." Counsel did enough to give Williams a reasonable shot at an acquittal.

Would interviewing Deford obviously have been a better use of time than the steps Inman actually took? The state court did not act unreasonably in concluding that interviewing Deford would not have seemed at the time an obviously superior thing to do, because Deford *had* been interviewed, by the police. What Deford said then (in 1998) is that his entire description had come from Smith—in other words, that Smith had seen the attack, and he had not. Given the hearsay rule, this meant that Deford had nothing useful to contribute. Lawyers preparing for trial act sensibly in deciding not to re-interview witnesses who have already revealed that everything they could say would be inadmissible.

There are two potential responses to this.

Perhaps there is a *per se* rule that lawyers always must interview persons who were near the crime in order to learn whether they are in fact eyewitnesses, whether or not they have talked to the police. But the Supreme Court has never announced such a rule, and under 28 U.S.C. §2254(d) only the decisions of the Supreme Court are enforceable on collateral review. What is more, this court has held that no constitutional rule forbids lawyers from relying on interviews conducted by the police when deciding what additional inquiries are in order. *Bieghler v. McBride*, 389 F.3d 701, 708 (7th Cir. 2004).

The second potential reply is that what Deford told the police in 1998 was inconsistent with what Smith said in 1998 (and with Smith's testimony at trial in 1999). Yet the conflict, if there was one, was in detail rather than substance. Deford told the police that he was just relaying

what Smith had told him she had seen. Deford may have remembered Smith's statements poorly, but the hearsay rule forecloses this as a ground of examination. (Deford may have seen a few things, such as the prone body, independently; the point is that according to Deford's 1998 version all details about who did what to whom came from Smith.)

Only if Deford had told the police in 1998 that Smith *could not* have seen what she claims to have seen would there be a strong conflict, and thus a pressing need to interview Deford. This is what Deford *did* say in 2004. But in 1998 he said otherwise. The police inquired in 1998 whether Deford had any reason to doubt Smith's ability to see what had happened:

Officer:   Did you ask [Smith] how she could see this?

Deford:   No I did not.

Officer:   Where did you assume that she saw this?

Deford:   While we were sitting on 21st Street, making a turn.

Officer:   During that 2 minute time?

Deford:   Yes.

Williams's lawyer had this transcript, which gave him every reason to think that an interview of Deford would have been pointless. And the state court concurred. Indiana's judiciary concluded that counsel exercised reasonable tactical judgment, and indeed that Deford's statement in 2004 was a recent fabrication: the trial judge expressly found Deford not credible. This latter finding

means that, had Deford been called in 1999, a hearsay objection would have prevented him from testifying. He had no information useful to the defense—or so counsel reasonably could have concluded. Whatever one may say in retrospect, the state court did not exceed the bounds of reasonableness in concluding that Inman did not commit an "egregious" omission from 1999's perspective.

This is not to deny that Inman may have had reasons to doubt whether Deford really was just passing along Smith's observations. How could she have seen the mêlée and Deford not? But to pose such a question is not to show that the state court's disposition was unreasonable. Deford was the driver and was looking where he was going, at the road ahead of him, while Smith, a passenger, could swivel her head to watch a fracas on the sidewalk. Passengers often see things that drivers do not. And Deford does not see very well. The record does not disclose details about his peripheral vision at night. Williams contends that Deford must have had at least 20/40 vision with the aid of glasses or contact lenses, because that's necessary for a commercial driver's license (which Deford would have needed to drive a tow truck, the occupation he claimed to pursue), but (a) the record does not show that Deford actually had such a license, (b) it does not show that Deford was wearing his glasses at the time in question, and (c) it does not even show that Deford drove a tow truck. Deford *said* that he drove a tow truck, but the state judiciary disbelieved him. If the record contained some evidence corroborating Deford's asser- tions, such as a commercial license or even a pay stub from

a tow-truck operator, then we might get an indirect estimate of his visual acuity. But all we have is Smith's statement that Deford was legally blind, the observation that he wore thick glasses at his deposition in 2004, and Deford's self-serving assertion that he could see well enough. A federal court can't assume the truth of Deford's testimony and use that assumption to override the state court's conclusion that he is not credible.

The state court made two vital findings of fact. One is that Deford was lying in 2004. The other is that Inman made a reasoned tactical decision not to interview Deford, given what Deford already had said to the police. A state court's resolution of a factual dispute stands unless it failed to develop the record fully and "clear and convincing evidence" demonstrates that an error occurred. 28 U.S.C. §2254(e).

We do not think that clear and convincing evidence contradicts the finding that Deford was lying in 2004 about what he had seen, about whether Smith could have seen what she said she had, and about how he would have testified if called in 1999. Such a finding, if made by a federal district judge on the existing record, would have to be sustained on appeal. See *Anderson v. Bessemer City*, 470 U.S. 564 (1985) (discussing the standard under Fed. R. Civ. P. 52). On review under Rule 52, a court of appeals respects a credibility finding unless the judge has taken a view inconsistent with the laws of physics or with uncontradicted documentary evidence. Nothing of that sort undermines the state judge's conclusion that Deford told the truth to the police in 1998 and lied at his deposi-

tion in 2004. The contradiction is itself all that's needed to support a credibility decision. That Deford has some kind of visual impairment also is undisputed; there may be doubt about how severe the impairment is, but its existence is real, and this too supports the credibility decision. The standard under 28 U.S.C. §2254(e) is even more favorable to the findings under review, but since these findings would survive an appeal under Rule 52 they must stand under §2254(e) as well.

As for the question whether Williams's lawyer made a tactical decision: at the post-conviction hearing, Inman said that he did not remember the case well, or Deford's statement at all. Because he didn't remember Deford's role, he could not give a specific reason for not interviewing him. But Inman added that he routinely interviewed anyone who appeared to have any evidence, but that just as routinely he did not interview people who did not seem to have exculpatory evidence. That's the basis of the state court's inference that Inman made a tactical decision not to interview Deford. A lawyer's description of his normal practice allows a state court to conclude that he acted in accord with that practice. (This is a routine inference, in tort law as well as post-conviction review.) Williams's current rendition of this as equivalent to "counsel didn't have a reason" is incorrect; that Inman could not remember a reason is well short of the proposition that he did not have one; we can not fault the state court for concluding that counsel acted in accord with his regular practice and thus had tactical reasons for his decisions.

Williams argues as if this appeal were a replay of *Stanley v. Bartley*, 465 F.3d 810 (7th Cir. 2006). He thinks that *Stanley* establishes a rule that failure to interview any potential witness leads to collateral relief automatically. *Stanley* did not announce any such rule—and, if it had, it could not be reconciled with §2254(d), which says that only decisions of the Supreme Court may be enforced against the states on collateral review. New rules, such as "interview all potential eyewitnesses", must be established on direct appeal; they can't be devised by federal courts of appeals and applied retroactively to set aside the judgments of state courts. See, e.g., *Carey v. Musladin*, 549 U.S. 70 (2006); *Wright v. Van Patten*, 128 S. Ct. 743 (2008).

At all events, Williams misreads *Stanley*. That decision relied heavily on the context of counsel's omission. Stanley's lawyer did nothing for him. The biggest omission was to disdain an interview of a witness who counsel knew (or should have known) to have exculpatory information. Counsel was not saving time on interviews in order to do something better. To the contrary. Stanley's lawyer did not prepare for trial; he just showed up and winged it. That's ineffective assistance, when information in counsel's possession suggested that some potential witnesses had exculpatory information. Here, by contrast, (a) Inman did considerable preparation before trial; and (b) Inman had in his hands an interview of Deford implying that Deford did not possess exculpatory evidence. Our situation is a considerable distance from *Stanley* on the dimensions that matter.

Unless counsel never can rely on statements taken by the police, a state court does not act unreasonably when holding that choices such as Inman's fall short of ineffective assistance. Because the Supreme Court has not established such a *per se* rule we do not have a single "egregious" omission that spoils what was otherwise a competent defense. Given the state court's findings of fact, and the context of the complete work Inman did for his client, the state judiciary's decisions cannot be set aside under the standard of §2254(d).

AFFIRMED