In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 18-3264

TYRUS D. COLEMAN,

*Petitioner-Appellant,*

*v.*

RON NEAL, Warden, Indiana State Prison,

*Respondent-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:16-cv-301 PPS — **Philip P. Simon**, *Judge.*

———————————

ARGUED OCTOBER 1, 2020 — DECIDED MARCH 11, 2021

———————————

Before EASTERBROOK, MANION, and ROVNER, *Circuit Judges.*

PER CURIAM. Tyrus Coleman is serving a 45-year sentence for the attempted murder of Anthony Dye. He was tried twice. The jury in the first trial acquitted him of murdering Jermaine Jackson but could not reach a unanimous verdict on the charge of attempting to murder Dye. At the second trial, which was limited to the attempted-murder charge, the jury returned a guilty verdict. Coleman says that this se-

quence violates the Double Jeopardy Clause of the Fifth Amendment, applied to the states through the Due Process Clause of the Fourteenth. Coleman also accuses his lawyer of providing ineffective assistance at the second trial. State courts rejected both of these arguments, as did a federal district court. 2018 U.S. Dist. LEXIS 76497 (N.D. Ind. May 7, 2018), reconsideration denied, 2018 U.S. Dist. LEXIS 160799 (N.D. Ind. Sept. 20, 2018).

The events were captured on a surveillance camera. Both juries saw this video. The district court reviewed it and concluded that the Indiana Supreme Court had narrated the facts accurately:

> Tyrus Coleman shot his friends Anthony Dye and Dye's son Jermaine Jackson during a confrontation on Coleman's property, where Coleman operated a music recording studio. The confrontation stemmed from an event occurring approximately four months earlier in which Omar Sharpe, one of Coleman's musician clients, robbed Dye at gunpoint. Coleman retrieved part of the stolen property from Sharpe and returned it to Dye. [Jackson] was irritated when he later learned that Sharpe had robbed his father, but Dye asked him not to get involved. On the afternoon of the shootings, [Jackson] discovered that Sharpe was present at Coleman's studio and frantically phoned Dye to "[c]ome over here right now." Armed with a handgun Dye headed to Coleman's studio. In the meantime an armed and agitated [Jackson] pushed open the door to the studio and attempted to enter. Sharpe, who was present inside, prevented [Jackson's] entry and closed the door. Exiting the studio Coleman attempted to calm [Jackson] and to dissuade him from trying to enter. Coleman called a neighbor to come over to help calm [Jackson]; he also called his business partner to inform him of the situation. The neighbor testified that he tried to talk with [Jackson] by telling him what he [Jackson] was doing "wasn't worth it. Just go ahead and leave. There was kids around and people around that didn't have nothing to do with what they was angry about." According

to the witness [Jackson] responded by saying, "F* *k that. He didn't think about that s* *t when he did the s* *t to my Daddy." Coleman armed himself and walked back and forth in front of the studio door holding his handgun at his side. As Coleman was making a phone call, Dye came into the yard through a front gate carrying a handgun which was pointed toward the ground. Dye strode toward his son [Jackson], who was standing next to Coleman on the patio in front of the studio. Within three seconds, the following occurred: Dye stepped onto the patio where [Jackson] and Coleman were standing. As Dye stepped in front of Coleman, Coleman raised his gun and fired at Dye, who immediately fell to the ground. Coleman then shot Dye a second time. At that point Coleman "turned to Jermaine [Jackson]." Coleman saw that [Jackson's] handgun, which before that time had been concealed under his shirt and in a holster, was "pointed at [Coleman]," and Coleman shot [Jackson]. [Jackson] fell to the ground and died at the scene as a result of his injuries. After the shooting, Coleman drove to Milwaukee disposing of his weapon along the way. Several days later he returned to Elkhart and surrendered to the police.

*Coleman v. State*, 946 N.E.2d 1160, 1163–64 (Ind. 2011).

Coleman contends that the first jury must have found that he acted in self-defense when killing Jackson and that this conclusion necessarily applies to Dye as well. He relies on *Ashe v. Swenson*, 397 U.S. 436 (1970), and its successors, which hold that principles of issue preclusion are part of the rule against double jeopardy. The parties have sparred over the extent to which 28 U.S.C. §2254(d)(1) applies to the Indiana Supreme Court's contrary conclusion. We need not resolve that debate, because it does not require even an ounce of deference to conclude that Coleman's acquittal on the murder charge does not establish that he acted in self-defense when shooting Dye.

*Currier v. Virginia*, 138 S. Ct. 2144, 2149–50 (2018), tells us to read acquittals for the least they must establish, not the most that they might represent. It is scarcely necessary to do more than reread the state court's summary of the facts to conclude that the jury in the first trial readily could have found that Coleman tried to defend himself against Jackson but had no such justification for shooting Dye. By the time Coleman shot Jackson, his father Dye was on the ground with two bullets in him, and Jackson had opened fire at Coleman. A jury might well have thought that Coleman returned Jackson's fire to defend himself. But that does not imply anything about Dye's earlier shooting. Dye had a gun but was not pointing it at Coleman and did not pull the trigger. Coleman nonetheless shot Dye *twice*, including once after he was on the ground.

We do not know why the first jury was unable to reach a unanimous verdict with respect to Coleman's shooting of Dye. Perhaps some jurors were impressed by Coleman's knowledge that Dye had a reputation for violence. That reputation may have left Coleman in fear of a gun-toting Dye— but the jury's acquittal on the charge that Coleman murdered Jackson does not establish in Coleman's favor any fact such as the possibility that Coleman shot Dye because of that fear. Dye and Jackson are different people who posed different threats (if Dye posed any at all). Coleman tries to tease a form of retroactive self-defense toward Dye from the jury instructions about crimes committed close in time, but we find the argument implausible—and it is at all events an argument based on state law that the state's highest court evidently found wanting. Given the rule of *Currier*, the Double Jeopardy Clause does not entitle Coleman to be acquitted on both charges.

This leaves Coleman's attack on the performance of his lawyer. The state's highest court applied the rule articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), but in one respect it did so unreasonably: when deciding whether Coleman suffered prejudice, it viewed each of the asserted errors in isolation, rather than asking whether counsel's errors were prejudicial cumulatively. Coleman commits the opposite error: instead of asking whether the defense *as a whole* was constitutionally adequate, he supposes that any one mistake entitles him to collateral relief. *Strickland* says, however, that it is the full course of representation that matters. 466 U.S. at 690–96. There is a potential exception for a whopper of an error that nullifies all of the good things that counsel did, see *Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009), but none of the arguments that Coleman advances falls in that category.

The district judge covered Coleman's arguments thoroughly, 2018 U.S. Dist. LEXIS 76497 at *18–32, and supplied the all-things-considered evaluation of prejudice that the state court omitted, *id*. at *32–33. We need not repeat the district court's analysis, though we reproduce its handling of one issue to give a flavor of Coleman's contention and the district court's evaluation.

Dye testified for the prosecution at both trials. In two respects his testimony was subtly different, and Coleman's lawyer did not try to impeach Dye at the second trial on the basis of an asserted inconsistency. Here's what the district court wrote (*id*. at *23–25) (boldface and bracketed material in original; record citations omitted):

> Coleman argues that trial counsel was ineffective for failing to impeach Dye with inconsistent testimony from the first trial and

pending charges and failing to question Dye regarding his gun. The first inconsistency highlighted by Coleman is that, at the first trial, Dye testified that, prior to the shootings, he might have asked Jackson about Omar Sharpe's location, but, at the second trial, he testified that he did not say anything. Coleman also notes the following inconsistency in the testimony regarding Coleman's involvement in the prior robbery of Dye. At the first trial here's what Dye said:

> **Trial Counsel**: And you didn't — you knew that [Coleman] wasn't involved in this robbery?
>
> **Dye**: Well, I protected him to the end. Anytime somebody would ask me I would always say no. [Coleman] ain't have nothing to do with it. That was my take on it.

And then at the second trial, here's what he said:

> **Trial Counsel**: Okay. You knew Tyrus didn't have anything to do with the robbery, right, the — Omar's robbery of you?
>
> **Dye**: At first. I mean, when it first happened, you know, I gave him the benefit of the doubt, you know. Everybody else, though, kept putting him in it, but I protected him til the end.

In my view, these are trifling discrepancies in Dye's testimony. Trial counsel may have felt that pointing out such modest inconsistencies would have been silly and nitpicky. That's a judgment call.

The Court of Appeals determined that counsels' failure to impeach did not result in prejudice under *Strickland*; that decision was entirely reasonable. After reviewing the record, I find that the State court's determination regarding trial counsel's failure to impeach Dye was not objectively unreasonable. Coleman argues that the failure to impeach prejudiced him because the prosecution's case primarily relied on Dye's testimony and the video recording, which meant that Dye's credibility was pivotal to the jury's decision. Coleman does not further elaborate on this argument, and it is not clear that Dye's credibility was a material consideration by the jury. The entire episode was captured on

video for the jury to review. In all likelihood, the video is what made the case. In any event, Coleman has not cited any portion of Dye's testimony that substantially undermined his defense.

Coleman also argues that trial counsel was ineffective for failing to ask Dye whether his gun was loaded. The appellate court rejected this claim, reasoning that whether the gun was loaded was irrelevant because Coleman had no knowledge regarding this detail. In other words, whether the gun was loaded or not was neither here nor there because there was no way for Coleman to have known this, and that is the only person that matters. The court concluded that asking this question would not have changed the outcome of the proceedings, and therefore there is no prejudice under *Strickland*. This conclusion is entirely reasonable.

We agree with the district judge's analysis. And we add that the overall performance of counsel was admirable. The shootings were captured on video, yet counsel persuaded the first jury to acquit on one count and not reach a verdict on the other. That counsel could not do as well with the second jury does not demonstrate a violation of the Constitution.

AFFIRMED