# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1566

KEITH BLAND, JR.,

*Petitioner-Appellant*,

*v.*

MARCUS HARDY, Warden,
Stateville Correctional Center,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 2602—**John W. Darrah**, *Judge*.

ARGUED OCTOBER 25, 2011—DECIDED FEBRUARY 13, 2012

Before EASTERBROOK, *Chief Judge*, HAMILTON, *Circuit Judge*, and MYERSCOUGH, *District Judge*.[*]

EASTERBROOK, *Chief Judge*.   A jury concluded that Keith Bland set out to steal some guns from his father's house and did not care who got hurt. He and his confederates found his stepmother at home. She was exe-

_____

[*] Of the Central District of Illinois, sitting by designation.

cuted by a bullet to the back of her head. A state court sentenced Bland to 71 years' imprisonment for murder and armed robbery. His conviction was affirmed on appeal, and the state judiciary rejected a collateral attack. He then tried federal court under 28 U.S.C. §2254 and lost again. 2010 U.S. Dist. LEXIS 13624 (N.D. Ill. Feb. 12, 2010). We issued a certificate of appealability, see 28 U.S.C. §2253(c), and appointed counsel to represent Bland on appeal.

Counsel's lead argument is that the prosecutor violated the due process clause of the fourteenth amendment by taking advantage of an error during Bland's testimony. Bland said that he had been arrested on felon-in-possession charges in January 2000, and that the police had confiscated his .38 caliber handgun. The robbery and murder took place in September 2000, and during closing argument the prosecutor argued that the confiscation of a gun eight months earlier gave Bland a motive to steal another (since he could not buy a gun lawfully). But Bland's memory was faulty; he had been arrested, and the gun confiscated, in January 2001, not January 2000—and the prosecutor knew it. This sets up Bland's argument that the prosecution violated the constitutional rule against knowingly using false testimony. See *Napue v. Illinois*, 360 U.S. 264 (1959); *Giglio v. United States*, 405 U.S. 150 (1972).

The state judiciary assumed that the prosecutor violated a constitutional norm but found that Bland had not suffered any injury. Using the right date, a prosecutor could have argued that Bland's possession of a .38 caliber

handgun in January 2001 was evidence of guilt, because that type of gun delivered the fatal shot. We need not decide whether this is right, because Bland's substantive argument does not get past the screen in 28 U.S.C. §2254(d), a part of the Antiterrorism and Effective Death Penalty Act. Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Bland's claim was adjudicated on the merits in state court, whose decision was neither contrary to, nor an unreasonable application of, *Napue* and similar decisions.

*Napue* and *Giglio* hold that a prosecutor may not offer testimony that the prosecutor knows to be false. They do not hold that a prosecutor is forbidden to exploit errors in testimony adduced by the defense. Prosecutors often know that defense testimony is wrong.

For example, a defendant may testify to a false alibi. A prosecutor who knows that the defendant's testimony is bogus is entitled to take advantage of the opportunity to undermine the defense, perhaps by arguing that the testimony conflicts with that of other witnesses and that someone must be lying, or perhaps (parallel to the situation here) by arguing that, if the alibi is truthful, it shows that the defendant had a motive, or was committing some other crime that reflects poorly on his honesty. The prosecutor not only argued that the supposed arrest in January 2000 was evidence of motive but also tried to exploit an alibi that the prosecutor thought fishy: Bland testified that he was selling cocaine when the murder occurred. The prosecutor, who did not believe that alibi, nonetheless used it to contend that Bland had depicted himself as a person who would violate the law, including the laws against murder and perjury, whenever he thought he could get away with it. Bland does not contend that this use of his testimony violated *Napue*; it is hard to see why the use of his testimony about the date a gun had been confiscated from him would do so.

Bland's able counsel in this court concedes that no decision of the Supreme Court clearly establishes that a prosecutor cannot make hay from a defendant's false testimony. Instead counsel appeals to "fundamental fairness." And there is something unsettling about a prosecutor using a defendant's testimony to contradict a known fact. But "fundamental fairness" is too high a level of generality to satisfy §2254(d)(1). Until the Supreme Court has made a right *concrete*, it has not been

"clearly established." See, e.g., *Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008); *Carey v. Musladin*, 549 U.S. 70, 77 (2006). More: the principal role of the due process clause is to ensure a trial at which the truth can emerge through an adversarial presentation. Nothing prevented Bland's defense team from correcting his testimony. The date of his arrest was well documented; his lawyer had the papers just as the prosecutor did. Bland's counsel could have corrected the error when it was made, or immediately after he left the stand, or even in closing argument (the prosecutor spoke first, as is normal). There is nothing "fundamentally unfair" about leaving to the adversarial process the exchange of arguments about inferences to be drawn from the date of an arrest and a weapon's confiscation, when both sides have equal access to the facts.

Bland relies on the due process clause for a second argument. The Supreme Court held in *Doyle v. Ohio*, 426 U.S. 610 (1976), that because *Miranda* warnings assure suspects that they need not answer an interrogator's questions, it violates the due process clause for a prosecutor to ask a jury to infer guilt from silence. That inference would contradict the warnings and double-cross the suspect. Bland contends that the prosecutor violated this rule by asking an officer who had interrogated Bland what happened when the officer asked a particular question. The officer replied that Bland put his fingers in his ears, pretended that he had not heard the question, and shouted "blah, blah, blah, blah" in an effort to drown out that question and future questions. Bland now contends that a shouted "blah" is the

same as "silence" because, like genuine silence, it does not convey information.

We may suppose, without deciding, that making a rude noise or reciting "Jabberwocky" in response to a question is the functional equivalent of silence. *Miranda v. Arizona*, 384 U.S. 436 (1966), is based on the self-incrimination clause of the fifth amendment (applied to the states through the due process clause of the fourteenth). The four famous warnings are designed to ensure that a suspect knows that he need not provide incriminating evidence, unless the government supplies immunity (which makes the evidence no longer incriminating). Neither a rude noise nor a string of nonsense words is incriminating.

This assumption does not benefit Bland, however, because he did not make loud noises from the outset. He met with police several times, waived his right to remain silent, and made statements. He said, among other things, that he had been playing basketball with Christopher Scott the afternoon of the murder. That was his first proffered alibi—and at trial, when he gave a different alibi (that he had been selling cocaine all day), he necessarily conceded that he had been lying. The police cottoned onto the lie much earlier, and they asked Bland how other facts they had discovered (including Scott's confession that he and Bland had cooked up this alibi) could be reconciled with the story about basketball. That is when Bland put his fingers in his ears and refused to say more. We therefore do not have a situation in which a suspect was silent throughout;

we have instead a situation in which the suspect said some things, and a later decision to clam up may illuminate the significance of what *was* said.

*Anderson v. Charles*, 447 U.S. 404 (1980), holds that *Doyle* does not prevent a prosecutor from using a decision to stop talking as the basis for an inference that what the suspect had said earlier was false—or perhaps that the suspect was implying its truth by refusing to add corroborating detail. See also *Fletcher v. Weir*, 455 U.S. 603 (1982); *Jenkins v. Anderson*, 447 U.S. 231 (1980). Prosecutors always can put in evidence of, and make arguments about, what suspects actually say. Just as flight to avoid apprehension can reflect consciousness of guilt, so a sudden silence can reflect a suspect's consciousness that he has dug himself into a hole and cannot see an exit. That's a fair subject for comment, *Charles* holds, though an express invocation of the right to remain silent might not be. *Doyle* and *Charles* show that, when a suspect in custody starts talking and then stops, the constitutional line can be a fine one. Given the deferential standard we apply on collateral review, see 28 U.S.C. §2254(d), it is enough to conclude here that the state courts' decision was not contrary to, or an unreasonable application of, the Supreme Court's clearly established law.

Finally, Bland contends that the court violated the Constitution by requiring him to wear a stun belt during trial, without first finding that this was necessary for security in the courthouse. See *Deck v. Missouri*, 544 U.S. 622, 626–29 (2005). We concluded in *Stephenson*

*v. Wilson*, 619 F.3d 664 (7th Cir. 2010), that the need for a particularized showing of dangerousness was clearly established before 1997; the rule is thus no less applicable to Bland's trial than it was to Stephenson's. The prosecutor did not try to show that Bland is too dangerous to be left unrestrained in a courtroom—but then Bland did not ask for such proof. Perhaps this was because his lawyer thought that the prosecutor could have supplied it, so there was no reason to belabor the issue; but perhaps his lawyer missed an opportunity to do some good for the defense by removing the risk that the jury would believe that Bland had already been adjudicated to be a menace to anyone near him. Bland's current lawyer takes the latter view, blames trial counsel for not demanding a hearing, and chastises appellate counsel in state court for not attacking the performance of trial counsel.

To preserve a question for federal collateral attack, a person must present the contention to each level of the state judiciary. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999). Illinois contends that Bland scuttled his claim by omitting one important element from his direct appeal (he did not tell appellate counsel about the stun belt until three months after the briefing had been completed; no wonder the subject went unmentioned) and another from his presentation to the Supreme Court of Illinois when filing a petition for leave to appeal. We need not decide whether Bland has committed a procedural default, because his argument fails on the merits. 28 U.S.C. §2254(b)(2).

Bland devotes much of his brief to arguing that Illinois failed to hold the sort of hearing required by *Deck* and its predecessors. Yet that argument was forfeited in state court, and it can be resurrected only as part of the "prejudice" component of a contention that Bland received ineffective assistance of counsel. The state judiciary found no prejudice because, it believed, the stun belt was not visible to the jury. (It was under Bland's shirt.) Prejudice is one of two components of the ineffective-assistance inquiry under *Strickland v. Washington*, 466 U.S. 668 (1984). The other is objectively deficient performance—performance *so* bad that the lawyer was not the sort of "counsel" of which the sixth amendment speaks. Bland has not demonstrated that he received assistance that bad.

Bland assumes that all he need do to establish deficient performance is to assert that, if counsel had made a simple objection, the stun belt would have vanished. After all, Bland observes, the record does not establish that he is too dangerous to be allowed to sit in a courtroom unrestrained. But it does not follow that a word from counsel would have eliminated the stun belt; instead a word from counsel might have precipitated a hearing, the outcome of which may have been to proceed with the stun belt, or perhaps to make it less visible. A hearing also might have explored whether the belt *was* visible to people sitting in the jury box, and whether laypersons would infer that a bulky device under a shirt was a stun belt as opposed to a back or rib cage support of the type that many athletes wear. Even if Bland could have established that

a hearing would have required the state to get rid of all physical restraints (relying instead on guards in the courtroom) or to use a less bulky, and hence less visible, restraint, it would not follow that counsel had furnished ineffective assistance. A stun belt may be less prejudicial to a defendant than a courtroom full of armed guards. What's more, the question under *Strickland* is not whether the lawyer made a mistake, even a serious one; it is whether the lawyer's *overall* performance was professionally competent. See, e.g., *Strickland*, 466 U.S. at 686–96; *Williams v. Lemmon*, 557 F.3d 534 (7th Cir. 2009). A single error may suffice "if that error is sufficiently egregious and prejudicial." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). "Lest this exception swallow the rule, however, we must take the Justices at their word and search for an 'egregious' error—an omission of something obviously better (in light of what was known at the time) than the line of defense that counsel pursued." *Williams*, 557 F.3d at 538.

When a federal court must decide whether a state court contradicted the Supreme Court, or resolved an issue unreasonably, see §2254(d)(2), the petitioner is not entitled to an evidentiary hearing. Review proceeds on the evidentiary record compiled in state court. See *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). That principle tied the hands of the lawyer we appointed to assist Bland, for counsel had to make do with an essentially empty record. What do we know from the record about whether the state *could* have shown Bland to be dangerous enough to warrant use of a visible restraint? Nothing. What do we know from the record about

whether people in the jury box (the actual jurors, or surrogates participating in a test) would have inferred that the bulge was a stun belt as opposed to a back brace? Nothing. (Bland filed his own affidavit asserting that the jurors must have inferred from the bulk under his shirt that he had a stun belt, but this issue should be examined from the jurors' perspective, not from the defendant's.) What do we know from the record about what alternative security steps the state would have used had the judge ruled out a stun belt? Nothing. These omissions are no fault of the state judiciary; they reflect the absence of any effort by Bland to provide the information to the state judges. This makes it very hard for a federal court to say that counsel missed an easy and important strategic victory by withholding an objection to the stun belt.

By contrast, the record does show that counsel put up a vigorous defense. Omitting a motion directed to the stun belt is not the sort of inexplicable omission that renders even an apparently sturdy defense so deficient that the representation as a whole fell below an "objective standard of reasonableness." *Strickland*, 466 U.S. at 688. That the defense was generally capable implies, instead, that counsel did not raise the stun-belt question because he did not expect the issue to confer much if any advantage on the defense. *Strickland* tells us that evaluation of counsel's work as a whole is "highly deferential" (*id*. at 689) and that strategic decisions are "virtually unchallengeable" (*id*. at 690). The (essentially) empty record does not show that counsel made a terrible blunder that greatly diminished his client's chances.

This is an easier case for the state than *Stephenson*, and as the state prevailed in that case it prevails here too. Bland has not established that he received constitutionally inadequate assistance, so it is unnecessary to consider the subject of prejudice.

AFFIRMED