NOT DESIGNATED FOR PUBLICATION

No. 114,963

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

RICARDO M. ADKINS,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; DAVID J. KAUFMAN, judge. Opinion filed August 25, 2017. Affirmed.

*Michael P. Whalen* and *Krystle M.S. Dalke*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before ARNOLD-BURGER, C.J., MALONE and ATCHESON, JJ.


PER CURIAM: After an evidentiary hearing, the Sedgwick County District Court denied Defendant Ricardo M. Adkins habeas corpus relief from a jury verdict convicting him of raping a legally blind 18-year-old high school student and, thus, rejected his argument that he received incompetent legal representation leading up to and during the trial. Adkins has appealed that ruling and cites three ways his trial lawyer performed below the constitutional standard for adequate representation of criminal defendants. We have reviewed his claims, the hearing transcript, and the record in the underlying criminal

1

prosecution. We find no error in the district court's ruling, so we affirm the denial of Adkins' habeas corpus motion.

FACTUAL AND PROCEDURAL HISTORY

The trial evidence showed that Adkins approached L.M.B., the victim, while she was waiting for a city bus in Wichita on a weekday afternoon in April 2008 to go to a school soccer match. L.M.B. was gradually losing her sight and was in the process of learning how to get around using municipal transportation. Adkins offered to drive her to the soccer field. She hesitated but then accepted the offer. Adkins, however, went to a house where another man was present. After the two men visited briefly, Adkins took L.M.B. into a cluttered back bedroom and had sexual intercourse with her. L.M.B. testified at trial she was scared and never wanted to have sex with Adkins. She told the jury that part way through she told Adkins he was hurting her and asked him to stop. He didn't. At trial, L.M.B. acknowledged she did not physically resist Adkins or scream for help. She also told the jury the sex act lasted about 2 hours, a time estimate everyone agrees cannot be accurate. After L.M.B. and Adkins came out of the bedroom, he again spoke with the other man while she waited. Adkins then took her to the soccer match.

L.M.B. told her mother about the incident several days later. Because of her deteriorating eyesight, L.M.B. could not visually identify Adkins or the other man at the house. Law enforcement officers, however, were able to recover sufficient semen from the undergarments she wore the day of the incident to obtain a DNA profile. That profile, developed several months later, matched a known DNA profile of Adkins. Wichita police then interviewed Adkins. Initially, he denied knowing L.M.B. or having any contact with her. When informed there was DNA evidence linking him to a sexual encounter, he told police it must have been consensual and he had simply forgotten about it. The police obtained a DNA sample from Adkins that was forensically matched to the DNA profile from the biological evidence they had recovered from L.M.B.'s clothing. The State

2

charged Adkins with one count of rape, a severity level 1 felony violation of K.S.A. 21-3502(a)(1)(A).

Adkins' appointed lawyer defended the case on the theory of consent. Adkins did not testify. But the State presented the statements he had given the police, so the jury heard both his denial of any encounter and his later admission and characterization of the encounter with L.M.B. as a consensual one. Family members and acquaintances of L.M.B. testified that she was naïve, very trusting, and socially awkward to the point of being impaired in some of her interactions with other people. L.M.B.'s mother told the jury L.M.B. was occasionally "slow" to process things. The evidence, however, also showed L.M.B. received good grades in high school. L.M.B. testified that at the time of the trial she was taking classes at a school for the visually impaired with the goal of becoming a music teacher.

The jury convicted Adkins of rape. Based on Adkins' criminal history, the district court ordered him to serve a mid-range guidelines sentence of 586 months in prison. Adkins pursued a direct appeal, and this court affirmed the conviction and sentence. *State v. Adkins*, No. 102,560, 2011 WL 1196906, at *1 (Kan. App.) (unpublished opinion), *rev. denied* 293 Kan. 1108 (2011) (*Adkins I*). In *Adkins I*, the court outlined a fuller factual recitation, but that is familiar territory to the parties. See 2011 WL 1196906, at *1-2.

Adkins then filed a habeas corpus motion, as permitted by K.S.A. 60-1507, on the grounds the lawyer handling the criminal case in the district court provided representation that fell below the constitutional standard for adequacy, thereby violating his right to counsel guaranteed in the Sixth Amendment to the United States Constitution. The district court appointed a new lawyer to represent Adkins on the 60-1507 motion and held a nonevidentiary preliminary hearing. The district court summarily denied all but one of Adkins' claims. After an evidentiary hearing, the district court denied the remaining claim. Adkins appealed that ruling. This court reversed the summary disposition of

3

several claims and remanded those claims for an evidentiary hearing and otherwise affirmed the district court. *Adkins v. State*, No. 109,586, 2015 WL 1513948 (Kan. App. 2015) (unpublished opinion) (*Adkins II*). The district court held an evidentiary hearing at which the lawyer who represented Adkins testified. Adkins and Ulysses Franklin, the man who was at the house during the encounter with L.M.B., also testified. The district court found Adkins had been adequately represented before and during the trial and again denied his 60-1507 motion. Adkins has now appealed the second denial of his motion, and that is what we have in front of us.

LEGAL ANALYSIS

On this appeal, Adkins argues the district court erred in denying him relief on three points each of which he says amounted to constitutionally inadequate representation:  (1) the lawyer's failure to request a psychological evaluation of L.M.B. before trial; (2) the lawyer's failure to obtain medical records from L.M.B.'s hospital examination after she reported being raped; and (3) the lawyer's failure to call Franklin as a witness at trial. We take up each of those contentions after outlining the legal principles guiding our review in habeas corpus proceedings.

*Legal Principles*

When reviewing the denial of a 60-1507 motion after a full evidentiary hearing, an appellate court accepts the district court's findings of fact to the extent they are supported with substantial competent evidence. The appellate court exercises unlimited review of the determinative legal issues in light of those factual findings. *Bellamy v. State*, 285 Kan. 346, 355, 172 P.3d 10 (2007).

As we just said, a criminal defendant has a Sixth Amendment right to competent legal representation. To demonstrate constitutionally ineffective assistance by the lawyer

4

handling his criminal case in the district court, Adkins must show the representation fell below an objective standard of reasonableness resulting in legal prejudice, meaning there probably would have been a different outcome had the representation been adequate. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); see *Chamberlain v. State*, 236 Kan. 650, Syl. ¶¶ 3, 4, 694 P.2d 468 (1985) (adopting and stating *Strickland* test for ineffective assistance); see also *Edgar v. State*, 294 Kan. 828, 829-30, 283 P.3d 152 (2012) (acknowledging test recognized in *Strickland* and *Chamberlain* continues to govern 60-1507 proceedings). In short, Adkins must identify both substandard lawyering and resulting legal prejudice. As the United States Supreme Court and the Kansas Supreme Court have emphasized, review of the representation should be deferential and hindsight criticism tempered lest the evaluation of a lawyer's performance be unduly colored by lack of success notwithstanding demonstrable competence. See *Strickland*, 466 U.S. at 689-90 (noting potential distorting effects of hindsight review, so courts generally should presume lawyer's representation falls within "wide range of reasonable professional assistance"); *Holmes v. State*, 292 Kan. 271, 275, 252 P.3d 573 (2011). Rarely should counsel's representation be considered substandard when he or she investigates the client's circumstances and then makes a deliberate strategic choice among multiple options. *Strickland*, 466 U.S. at 690-91; *Rowland v. State*, 289 Kan. 1076, 1086, 219 P.3d 1212 (2009) (strategic choice entails lawyer's "'investigation of law and facts relevant to plausible options'") (quoting *State v. Gleason*, 277 Kan. 624, 644, 88 P.3d 218 [2004]).

In general, the courts look at a lawyer's overall performance in representing a criminal defendant in determining whether the Sixth Amendment right to counsel has been satisfied, meaning that a minor mistake or even a number of minor mistakes do not breach that duty. See *Harrington v. Richter*, 562 U.S. 86, 110-11, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011); *Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986); *Bland v. Hardy*, 672 F.3d 445, 450 (7th Cir. 2012) ("[T]he question under *Strickland* is not whether the lawyer made a mistake, even a serious one; it is

5

whether the lawyer's *overall* performance was professionally competent."). But a single error causing sufficiently substantial legal harm to the defendant to call into question an adverse outcome at trial or on appeal will suffice. See *Miller v. State*, 298 Kan. 921, 938-39, 318 P.3d 155 (2014) (applying *Strickland* test to error by lawyer handling direct criminal appeal).

Reviewing courts commonly first assess the quality of the representation, and if it satisfies the Sixth Amendment standard of adequacy, they dispense with any consideration of prejudice as unnecessary. But that is not an implacable approach. A reviewing court may deny relief based on the absence of prejudice to the defendant without specifically determining the constitutional sufficiency of the legal representation. See *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."); *Sola-Morales v. State*, 300 Kan. 875, 886, 335 P.3d 1162 (2014).

*Psychological Evaluation*

The Kansas Supreme Court has specifically allowed psychological examinations of complaining witnesses, *i.e.*, victims, in sex crime prosecutions. *State v. McCune*, 299 Kan. 1216, 1230-31, 330 P.3d 1107 (2014); *State v. Berriozabal*, 291 Kan. 568, 580-81, 243 P.3d 352 (2010); *State v. Gregg*, 226 Kan. 481, Syl. ¶ 3, 602 P.2d 85 (1979). The standards for getting such an evaluation are rigorous, as they should be. *Berriozabal*, 291 Kan. at 581 ("[A] defendant is entitled to a psychological examination of a complaining witness on a showing of compelling circumstances . . . ."). The court has developed half a dozen criteria to guide trial judges in determining whether to order an examination. *McCune*, 299 Kan. at 1231. The criteria consider the witness' demonstrable "'mental instability'" and "'lack of veracity,'" whether the witness has lodged false allegations of sexual abuse against other persons, and indicators the witness may have an unusual

6

understanding of "'what it means to tell the truth.'" 299 Kan. at 1231 (quoting *Berriozabal*, 291 Kan. at 581).

The district court may also consider evidence corroborating the victim's accusations against the defendant. If the defense request looks to be a "fishing expedition," the trial court may weigh that against allowing the examination. *Berriozabal*, 291 Kan. at 581. In *Berriozabal*, the court also cautioned that an "allegation of mental instability does not support the ordering of a psychological evaluation absent some real evidence." 291 Kan. at 581. The decision on a request for psychological evaluation rests in the district court's sound discretion. *Gregg*, 226 Kan. at 489.

Here, of course, the district court trying the criminal case never ruled on a request for a psychological examination of L.M.B. because Adkins' lawyer never asked for one. And the question for us is whether the lawyer's decision deprived Adkins of constitutionally adequate representation. At the 60-1507 hearing, the lawyer testified that she did not seek a psychological examination because nothing about L.M.B. suggested the district court would grant the request. The lawyer said she based her decision on a review of L.M.B.'s high school records, showing her to be an above average student, and on seeing L.M.B. testify at the preliminary hearing, where she appeared to be competent and coherent.

Based on the factors for obtaining a psychological evaluation and the rigorous review district courts are supposed to give those requests, the trial lawyer's decision reflects a reasoned and reasonable call. Nothing indicated to the trial lawyer that L.M.B. was afflicted with some mental illness or infirmity that impaired her ability to perceive or recall events accurately or that disposed her to prevaricate. See *State v. Gay*, No. 107,433, 2013 WL 517828, at *5 (Kan. App. 2013) (unpublished opinion); *State v. Coggs*, No. 104,934, 2012 WL 5364658, at *3 (Kan. App. 2012) (unpublished opinion) ("An examination might be warranted if a victim suffered from an illness impairing his or her

7

ability to accurately perceive or recall events or disposed him or her to tell falsehoods."). L.M.B. appeared to understand both the oath to tell the truth and the difference between truth and falsehood. L.M.B. had not made false accusations of sexual misconduct in the past. Nor was there information, let alone evidence, to suggest L.M.B. had a reputation or proclivity for mendacity. That sort of demonstrable "lack of veracity" would not, alone, support a psychological examination, although it might be admitted as free-standing reputation evidence. See K.S.A. 60-422; K.S.A. 60-446; *State v. Sampson*, 297 Kan. 288, 304, 301 P.3d 276 (2013).

Adkins' 60-1507 claim falters in two respects. First, he presents no additional information or evidence that would have supported a motion for a psychological examination of L.M.B. Rather, he says the lay witnesses' characterization of L.M.B. as socially guarded and, perhaps, "slow" coupled with her wholly inaccurate time estimate for the sexual encounter would have warranted the examination, if only his trial lawyer had asked. But that information does not seem to point to a diagnosable mental illness or recognized psychological condition calling into question L.M.B.'s ability to understand what is going on or to truthfully recount what had gone on—especially when the circumstances center on whether she consented to participate in sexual intercourse. Without something more, the district court correctly found no breach of the Sixth Amendment standard for adequate representation.

Second, Adkins has not tendered an affidavit or similar evidence from a psychiatrist or psychologist to the effect that L.M.B. *might have had* a diminished capacity to perceive and recall or to tell the truth that could have been diagnosed in a mental examination. Such an opinion would serve dual purposes. It would, of course, be the type of additional information Adkins' trial lawyer could have presented to support a motion for an examination. And it would also suggest that an examination could have yielded findings that might have led to a different result at trial. In other words, such a clinical diagnosis of L.M.B. arguably could have caused the jury to have a reasonable

8

doubt about her credibility and, thus, Adkins' guilt. But without that sort of evidence, Adkins cannot establish legal prejudice flowing from the failure to request an examination because he has offered nothing to show the result of the examination would have been even potentially helpful to his defense. He has failed to demonstrate prejudice satisfying the second part of the *Strickland* test for relief. The failure is fatal to this claim.

*Medical Records*

For his next point, Adkins argues his trial lawyer fell below the constitutional standard for adequate representation by failing to obtain the medical records from the physical examination of L.M.B. after she reported being raped. The argument spins off a question the lawyer asked L.M.B.'s mother during the trial about whether L.M.B. had suffered any physical injuries. She answered that L.M.B.'s "vaginal area was raw" and "her skin was sloughing off."

Adkins now contends that had the lawyer gotten the medical records she either would have seen those conditions documented and not asked the question or would have known the records contained no such information and used them to impeach the mother's testimony about injuries. Even if we assume the failure to obtain the medical records was a mistake (and it may have been), the oversight did not so detract from Adkins' defense to fall below the constitutional standard for adequate representation. The standard does not demand perfection, and minor mistakes to which most litigators may be vulnerable from time to time do not create Sixth Amendment violations.

In this case, we are inclined to put the question and answer in that category. The trial lawyer presumably sought to reemphasize L.M.B.'s lack of physical injuries as circumstantial evidence of consent. The lawyer could have done so with a short series of more precisely worded questions: L.M.B. had no broken bones, did she? No cuts? No bruises? Instead, the lawyer collapsed the line of questions into a single generic one with

9

less helpful results. But the answer, at least by negative implication, confirmed the absence of those sorts of injuries.

Even if we assume posing the question fell below the line for constitutional representation, we see little, if any, prejudice to Adkins. First, L.M.B. testified that she had vaginal bleeding following the sex act, so the jury already had that information. Second, nothing in the record evidence suggested vaginal rawness or bleeding proved directly or circumstantially that Adkins raped L.M.B. By her own account, L.M.B. did not physically resist Adkins. She said she submitted out of fear. When L.M.B. was examined at the hospital, her physical condition would have been essentially equally consistent with consensual sexual intercourse and a rape carried out through intimidation rather than physical brutality. L.M.B.'s mother's testimony about "injuries" could not have been the decisive factor in the jury's resolution of the charge.[*]

[*]The law did not and does not require a rape victim to physically resist the attack. Under the statute applicable to Adkins' prosecution, a defendant who compelled a victim to submit by inducing fear was guilty of rape. K.S.A. 21-3502(a)(1)(A) (overcoming victim "by force or fear" sufficient to establish crime of rape); *State v. Brooks*, 298 Kan. 672, 687, 317 P.3d 54 (2014). The current statute is the same. See K.S.A. 2016 Supp. 21-5503(a)(1)(A).

The criminal case turned on the credibility of L.M.B.'s account of the incident weighed against Adkins' account. The testimony from L.M.B.'s mother added nothing of significance to the evidence before the jury and bore little on the pivotal issue. In short, had the question not been asked, the verdict would have been the same. In turn, the lawyer's failure to obtain the medical records, which might have caused her to refrain from asking the question at all or might have provided a basis to dispute the answer, did not materially prejudice Adkins' defense. Under the *Strickland* test, the point warrants no relief on a 60-1507 motion.

10

*Failure to Call Franklin as a Witness at Trial*

Adkins contends his trial lawyer's failure to call Franklin as a witness severely undermined the defense and deprived him of constitutionally adequate representation. As we indicated, Franklin, who is Adkins' cousin, was present at the house when Adkins and L.M.B. arrived. And he remained there throughout the incident. The trial lawyer knew about Franklin and had an investigator interview him. At the 60-1507 hearing, the lawyer could not recall if she personally spoke with Franklin before the trial. She testified Franklin was available as a potential witness at trial but she made a decision during the trial not to call him.

At the 60-1507 hearing, Franklin testified that he spoke with a man working on Adkins' case and had a brief, nonsubstantive telephone conversation with a woman who was part of the defense team. Franklin testified that he recalled Adkins and L.M.B. coming to the house. He said he talked with Adkins for a little while after they arrived. L.M.B. didn't say much of anything, according to Franklin. Adkins and L.M.B. then went into the bedroom for 15 to 20 minutes. Franklin said he heard nothing during that time. When they came out, he and Adkins again talked. And L.M.B. was again silent. L.M.B. left with Adkins. According to Franklin, L.M.B. held Adkins' hand when they arrived, and he "believe[d] they were holding hands again" when they came out of the bedroom. At no point did Franklin perceive L.M.B. to be uncomfortable, upset, or scared.

During the trial, L.M.B. testified that she did not yell for help or scream when she was in the bedroom with Adkins, although she cried. L.M.B. testified only briefly as to what she did at the house after coming out of the bedroom. She said she asked to go to the bathroom and did so. Otherwise, she simply sat on the sofa waiting to leave.

The lynchpin of the State's case was L.M.B.'s testimony that she told Adkins to stop the sex act and he didn't. Even if L.M.B. had consented at the outset, her clear

11

withdrawal of consent would have rendered Adkins' continuation of the act through compulsion rape under K.S.A. 21-3502. See *State v. Flynn*, 299 Kan. 1052, 1053-54, 329 P.3d 429 (2014); *Adkins II*, 2015 WL 1513948, at *8. Franklin, of course, did not know what was said or done in the bedroom.

At the 60-1507 hearing, Adkins' trial lawyer testified that she viewed Franklin to be burdened with several negatives as a witness. At the time of the trial, the lawyer understood he was a transient living in a cheap hotel. He had a gang affiliation she feared the State would attempt to bring up and that might, in turn, cast Adkins in a poor light. Finally, he and Adkins were relatives, so the jury could easily discount his testimony as a biased reconstruction aimed at helping out kin. The trial lawyer also testified that Franklin's testimony was largely consistent with L.M.B.'s account:  She never claimed to have sought help while she was at the house or to have displayed or vocally expressed fear, outrage, or some other vehement reaction in Franklin's presence. Taking stock of all of those considerations, the trial lawyer said she made a calculated and studied decision against calling Franklin as a witness.

Consistent with *Strickland*, the trial lawyer's decision reflects a strategic choice that typically should not be second-guessed in a habeas corpus proceeding. The trial lawyer had investigated the circumstances bearing on calling Franklin as a witness and came to a deliberative tactical conclusion. Although members of this panel or other lawyers might have assessed the strategic factors differently, the question here is not what we think we might have done. Indeed, answering that question would be engaging in precisely the kind of hindsight analysis *Strickland* warns against. So, while the decision arguably may not have been the better tactical approach, it was a reasoned decision falling within the wide range of legal representation protected under *Strickland*.

Even if the decision against calling Franklin as a witness fell below the standard for adequate representation, it fails to generate prejudice sufficient to undermine the

12

verdict. As we have said, the case turned on the comparative credibility of L.M.B. and Adkins. The jury got to assess their truthfulness based on L.M.B.'s live testimony, Adkins' police statement, and a range of otherwise circumstantial evidence. L.M.B. and Adkins both had entries on the debit side of their veracity ledgers. For example, L.M.B. waited several days before disclosing what happened. And Adkins denied even knowing L.M.B. until confronted with the DNA evidence. The jury examined those ledgers and made a final accounting against Adkins—fulfilling its duty as the ultimate factfinder in a criminal case. See *State v. Frye*, 294 Kan. 364, 375, 277 P.3d 1091 (2012).

Had Franklin been called as a witness at trial and assuming he gave substantially the same testimony he provided at the 60-1507 hearing, we fail to see a sound basis to say the verdict probably would have been different. Franklin's testimony did not directly support or undermine the credibility of either L.M.B. or Adkins. Although his testimony itself didn't hurt Adkins, his appearance on the witness stand and his background conceivably might have. More importantly, however, Franklin's testimony would not have seriously undermined L.M.B.'s version of events or impugned her credibility particularly on the critical issue of what she told Adkins in the bedroom.

For those reasons, the trial lawyer's decision against calling Franklin as a witness does not warrant relief.

Finally, the points Adkins has raised do not collectively show he received less than constitutionally adequate representation up to and during the trial or that any inadequacies taken together call into question the jury's verdict.

Affirmed.

13